# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| SHERRI LITTON, et al., ) | |
| ) | |
| Plaintiffs, ) | **CIVIL ACTION** |
| ) | |
| v. ) | |
| ) | **No. 03-2377-KHV** |
| MAVERICK PAPER CO., et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

Sherri Litton, Ronald Litton and Paper Consulting And Design, LLC ("Paper Consulting") bring suit against Maverick Paper Company ("Maverick"), Robert W. Hatch and Richard Williamson, for various claims arising out employment and shareholder relationships with Maverick.

By virtue of the Court's order of January 28, 2005, which dismissed some of plaintiff's claims, see Memorandum And Order (Doc. #66), the following claims remain in the case: Sherri Litton's claims against Maverick for employment discrimination and retaliation under Title VII (Counts I and II); Ron Litton's claims against Maverick for employment retaliation under Title VII (Count III); Ron Litton's claims against Maverick for breach of the executive employment agreement (part of Count IV); Ron Litton's claims against Maverick for breach of the personal services agreement (part of Count V); Sherri Litton and Ron Litton's claims against Maverick for breach of implied contract (Count VIII); Sherri Litton and Ron Litton's claims against all defendants for breach of the shareholders agreement (Count IX); Ron Litton's claims against all defendants for breach of demand notes (Count X); Sherri Litton and Ron Litton's claims against all defendants for tortious breach of duty of good faith and fair dealing (Count XI); Sherri Litton and Ron

Litton's claims against all defendants for constructive fraud (Count XII); Sherri Litton and Ron Litton's claims against Hatch and Williamson for breach of fiduciary duty (Count XIII); and Ron Litton's claim against Hatch for fraudulent misrepresentation (Count XIV).  This matter comes before the Court on Defendants' Motion For Summary Judgment (Doc. #67) filed February 7, 2005.  For reasons stated below, the Court sustains the motion in part.

## I.    Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on its pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Rule 56(e) also requires that "copies of all papers or parts thereof referred to in an affidavit be attached thereto or served therewith." To enforce this rule, the Court ordinarily does not strike affidavits but simply disregards those portions which are not shown to be based upon personal knowledge or otherwise do not comply with Rule 56(e). Maverick Paper Co. v. Omaha Paper Co., Inc., 18 F. Supp.2d 1232, 1234-35 (D. Kan. 1998).

## II.    Facts

The following facts are either uncontroverted or, where controverted, construed in the light most favorable to plaintiffs:[1]

---

[1]      In response to defendants' statement of facts, plaintiffs repeatedly state that they controvert

(continued...)

**A.      Maverick And Its Shareholders**

In February of 1995, Ken Mast approached Ron Litton about starting Maverick, a paper converting and distributing company.  Litton recruited J.D. Battenberg to work for the company and until January of 1996, Mast, Litton and others ran the company.  During that time, Maverick was a fast-growing company which faced increasing demand for its services.  Maverick was undercapitalized, however, and needed additional capital to maintain excellent credit to meet the growing demand for its services.[2]

In late 1995, Mast told Litton and Battenberg that he wanted to sell the company.  Litton and Battenberg initiated discussions with Robert Hatch about purchasing the company.[3]  In January of 1996,

---

[1](...continued)
facts but cite no record evidence in support of their position.  See Plaintiff's [sic] Memorandum In Opposition To Defendants' Motion For Summary Judgment  ("Plaintiffs' Response") (Doc. #83) filed March 29, 2005 at 4-82.  Plaintiffs also cite numerous additional facts.  See id.  The Court considers only those additional facts which plaintiffs set forth in separately numbered paragraphs pursuant to D. Kan. Rule 56.1(b)(2).  See id. at 82-112.

[2]      The paper business is unique, in that suppliers uniformly employ strict credit guidelines and require prompt payment.

[3]      Plaintiffs allege that during these discussions, Hatch represented and/or promised Litton the following: (1) that he would provide capital to enable Maverick to obtain more credit and supplies and thereby grow and be profitable; (2) that Litton would be president; and (3) that Maverick would be a paper distribution company.  Plaintiffs further allege that based on these representations, Litton and others allowed Hatch to purchase the company.  See Plaintiffs' Response at 86-87.

In support of these allegations, plaintiffs cite the affidavit of Jim Armstrong.  See Plaintiffs' Response, additional facts ¶¶ 29-31, Exhibit 64.  Defendants object that plaintiffs have not provided sufficient foundation for such testimony.  See Defendants' Reply To Plaintiffs' Response To Uncontroverted Facts, And Defendants' Response To Plaintiffs' Additional Facts ("Defendants' Reply To Facts") (Doc. #92) filed May 5, 2005 at 122-23.  Pursuant to Rule 56(e), Fed. R. Civ. P., "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Armstrong's affidavit provides no information which demonstrates that he has personal knowledge regarding statements which Hatch made to Litton, or whether Litton relied on such statements.  Plaintiffs have not sought leave to
(continued...)

4

Litton, Battenberg, Hatch, Richard Williamson and other employees purchased Maverick.[4]  Out of 100,000

shares, Litton purchased 13,676 shares at $1.00 a share, for a debt investment of $13,676.00.  Hatch

purchased the largest number of shares and Williamson purchased the second largest number of shares.[5]

On January 16, 1996, the Maverick investors entered into a shareholders agreement.  With respect

to transfer of shares, the agreement provided that "[n]o shareholder will sell, assign, give, grant, donate,

pledge, mortgage, encumber, charge or otherwise dispose of or transfer any of his or her shares except with

prior Board Approval, or in accordance with the terms and conditions of this Agreement."  The agreement

further provided that a "redemption event" would occur upon the voluntary or involuntary termination of a

shareholder's employment with the company.  Defendants Exhibit 8, ¶ 4.1.  In cases other than for-cause

termination, the agreement stated that the redemption price would be the appraised value of the shares.  Id.

¶ 4.2.  It defined "appraised value" as the most recent determination of the fair market value of the company

prior to the applicable redemption event, divided by the number of shares outstanding on the date of which

such determination was made, determined as follows:  "The Chief Financial Officer will complete an

───────────────

[3](...continued)
supplement the affidavit.  The Court therefore disregards those statements for which plaintiffs have not
affirmatively shown that Armstrong has personal knowledge.  See, e.g., Plaintiffs' Response, additional
facts ¶¶ 29-32.

[4]     Hatch and Williamson had engaged in previous investments and business dealings with
Battenberg's uncle.
At an unspecified time, Hatch traded shares of Maverick to Williamson, in exchange for stock in
the Healthy Back Store.  The record is unclear regarding the facts surrounding this transaction.  Plaintiffs
cite pages 99 and 100 of Hatch's deposition but they have not attached those pages as exhibits to their
memorandum.  See Plaintiff's Response, additional facts ¶ 126.

[5]     The record is unclear regarding the number of shares which Hatch and Williamson
purchased.

appraisal of the fair market value of the Company as of the end of each fiscal year of the Company as soon thereafter as financial statements of the Company for such fiscal year are completed, such appraisal to be in accordance with such formulas, factors, and procedures as the Board directs." Id. ¶ 4.2(a).

Maverick shareholders chose Litton to serve as president because he was already running the company and he knew the most about the paper industry. From January of 1996 until January of 2002, Litton served as president and ran the day-to-day operations of the company.[6]  From 1997 to January of 2002, Litton also served as chief executive officer ("CEO") of Maverick. In addition, from January of 1996 until May of 2003, Litton served as a member of the board of directors.

From January of 1996 to the present, Hatch has served as Chairman of the Board of Directors of Maverick.[7]  Since January of 2000, Larry Kibler has served as its chief financial officer ("CFO"). Currently, Maverick operates only as a paper converter, i.e. it converts huge rolls of paper into smaller pieces of paper for customers.

**B.      Omaha Paper Purchases Maverick Shares**

In October of 1996, Robert Powell, who was president of Omaha Paper Company ("Omaha Paper"), told Litton that Omaha Paper would like to buy Maverick. Omaha Paper was substantially larger and had access to paper mills and mill-approved local franchises, which Maverick did not have. At the time, Maverick operated primarily as a paper distributor and access to mill franchises could substantially increase its ability to distribute paper.

---------------

[6]      Neither Hatch nor Williamson was involved in day-to-day operations, but Hatch made the financial decisions.

[7]      Before 1996, Hatch had virtually no experience in the paper industry. For a brief period of time in 1998, Hatch did not serve on the board.

At the end of 1996, Hatch loaned Maverick $531,000.00.  For 1996, the company suffered operating loss of $25,455.00 and net loss of $333,910.00.

In February of 1997, Maverick's board of directors approved an appraisal of Maverick shares at $2.75 a share.  On March 5, 1997, Maverick shareholders reviewed a potential sale of equity to five employees of Omaha Paper.  To facilitate the sale, they agreed to increase the total number of Maverick shares from 100,000 shares to 129,473 shares.  On the same day, Litton signed an executive employment agreement to work as president and CEO of Maverick.  The agreement provided that Maverick would pay Litton a minimum salary of $85,000 and give him a company car.  As to duties, it provided as follows:

> [Litton] shall devote his entire productive time, ability and attention to the business of [Maverick] and shall perform all duties in a professional, ethical and businesslike manner. [Litton] will not, during the term of this Agreement, directly or indirectly engage in any other business, either as an employee, employer, consultant, principal, officer, director, advisor, or in any other capacity, either with or without compensation, without the prior written consent of [Maverick].

Executive Employment Agreement at 1, Defendants Exhibit 7.

The agreement was for a term of three years, to be renewed automatically for successive one-year periods unless either party gave notice of termination 180 days in advance.  The agreement further provided that Maverick could terminate Litton's employment with or without cause, as defined therein, and specified the financial consequences of termination, as follows:

> A.  The Company's Board of Directors may at any time terminate the Executive's employment with or without cause.  The term "cause" as used herein shall mean (i) repeated insubordination or willful disobedience of the directions of the Board of Directors of the Company or (ii) habitual neglect of the duties to be performed under this Agreement or (iii) the engaging in any conduct which is dishonest, or damages the reputation or standing of the Company or (iv) the Executive is convicted of a criminal act, or (v) the Executive engages in any act of moral turpitude.

7

> B.  If the Employment Period is terminated by the Company with cause, the Executive shall be entitled to receive monthly payments equal to his Base Salary for a three month period commencing on the Termination Date.  If the Employment Period is terminated by the Company without cause prior to the end of the Employment period (other than pursuant to Section 7), the Executive shall be entitled to receive in twenty-four (24) equal monthly payments an amount equal to two times the sum of (i) his Base Salary and (ii) the higher of the amounts of incentive compensation paid to the Executive in the two years prior to the termination.  Payments of any amounts pursuant to this section other than payments for termination with cause shall be made in twenty-four (24) equal monthly installments.

Id. at 2-3.  The agreement further provided that it could "be modified only by a further writing that is duly executed by both parties."  Id. at 3.

On March 11, 1997, Omaha Paper and Maverick entered into a purchase agreement under which Maverick sold Omaha Paper 29,473 shares, at a price of $14.76 per share, for a total of $435,021.46.[8] As part of the transaction, Hatch and Williamson each agreed to sell four per cent of their Maverick stock (4,714 shares each, or a total of 9,428 shares) to Kevin Powell and Robert Powell.  In return, Kevin and Robert Powell each signed promissory notes to Hatch and Williamson totaling $139,157.28.  All Maverick shareholders, including Litton, signed the purchase agreement, which included as exhibits the promissory notes from the Powells to Hatch and Williamson.  Litton did not object to the stock sale by Hatch and Williamson.

---

[8]     The parties contend that Maverick sold Omaha Paper 25 per cent of its stock.  See Defendants' Memorandum In Support Of Motion For Summary Judgment ("Defendants' Memorandum") (Doc. #68) filed February 7, 2005, ¶ 25; Pretrial Order (Doc. # 89) filed April 21, 2005, ¶ 4(a), stipulation 14.  According to the Court's calculations, however, 25 per cent of 129,473 shares would be 32,368.25 shares.

The sales price was based on the prospect of Maverick gaining franchise mill access in Kansas City.  It was apparent to Litton, however, that Omaha Paper could not deliver mill franchises for Kansas City.

Maverick planned to use the sales proceeds for operating cash flow and to partially refinance its loans, including the $531,000.00 loan from Hatch.  To date, Maverick has not repaid the loan from Hatch and it has missed scheduled interest payments on the loan.

The purchase agreement provided that Litton was critical to the success of Maverick.  Specifically, it stated as follows:

> The parties hereto agree that Ron Litton is absolutely critical to the success of Maverick. Thus the parties believe it is necessary to ensure his continued employment and have signed him to an employment agreement dated March 4, 1997, attached as Exhibit D.

Purchase Agreement at 4, Defendants Exhibit 11.[9]

On March 11, 1997, Maverick shareholders entered into a new shareholders agreement which contained share transfer and redemption provisions which were nearly identical to the original shareholders agreement.  See Defendants Exhibit 10.  At the time, Litton owned 11,582 shares in Maverick, which he still owns today.

In June of 1997, in order keep the Omaha Paper group from demanding its money back at $14.76 per share, Maverick's chief financial officer ("CFO") appraised the shares at $1.67 per share, which the board approved.  Litton agreed with the valuation.

For 1997, Maverick suffered operating loss of $286,717 and net loss of $589,675.

## C.     Maverick Offers Stock Option To Employees

In February of 1998, as an incentive and to reward certain employees who had sustained reductions in salary, Maverick offered a stock option agreement which allowed employees to exercise options to purchase stock at $1.67 a share within the next ten years.  Litton received an option to purchase 2,197 shares, which he never exercised.  Litton's wife, Sherri Litton, worked in various positions at Maverick and

---

[9]     The exhibit numbers referenced in Defendants' Memorandum (Doc. #68) filed February 7, 2005, do not match the exhibit numbers on the Court's electronic filing system.  On May 23, 2005, at the Court's direction, defendants filed an index which cross references the old exhibit numbers to the new exhibit numbers.  See Doc. #96.  In this order, the Court refers to the old exhibit numbers.

received an option to purchase 1,698 shares.  Sherri Litton exercised her option on November 28, 2000.

### D.    Maverick Settles Lawsuit With Omaha Paper

In late 1998, Maverick settled a lawsuit with the Omaha Paper group.[10]  Under the settlement, all parties dismissed their claims and the Powells paid Maverick $55,000.  In addition, as part of the settlement, the Omaha Paper group transferred its Maverick stock (including the 9,428 shares which the Powells had purchased from Hatch and Williamson) back to Maverick.  In return for the 9,428 shares which the Powells had purchased from Hatch and Williamson, Maverick paid Hatch and Williamson $50,000 each.[11]  The settlement agreement did not reflect the $50,000 payments to Hatch and Williamson and no board minutes refer to the payments.  Maverick's general ledger, however, indicates that Maverick paid $50,000 each to Hatch and Williamson for the "buyback of stock."  Plaintiffs Exhibit 12.  According to Litton's calculations, Maverick paid Hatch and Williamson $10.60 per share for the stock which it bought back.

For 1998, Maverick suffered $116,793 operating loss and $604,341 net loss.

### E.    Maverick Promotes Sherri Litton To Operations Manager

During the summer of 1999, Litton promoted Sherri Litton from retail store manager to operations manager, a new position which he had created.  Maverick did not post the position and Sherri Litton did

---

[10]      Defendants assert that the lawsuit resulted from Omaha Paper's failure to deliver mill franchises and the Powells' failure to pay promissory notes, but they do not cite record evidence to support these allegations.  See Defendants' Memorandum ¶ 40.

[11]      Defendants insist that Maverick's payments to Hatch and Williamson were for the promissory notes which the Powells had signed, and not to purchase the Maverick stock.  Construed in the light most favorable to plaintiffs, the record supports an inference that Maverick compensated Hatch and Williamson for the 9,428 shares which it received from Kevin and Robert Powell – and for which the Powells still owed Hatch and Williamson under the promissory notes.

not complete an application or interview for the job. As operations manager, Sherri Litton was responsible for human resource functions such as payroll, accounts payable, accounts receivable, building maintenance, small equipment purchases and job safety. Before the promotion, Sherri Litton had no formal training in human resources, although she had attended one seminar on payroll and benefit administration. She received no training on human resources policies and procedures or sexual harassment complaints.

**F.    Hillcrest Loan Workout**

During 1999, Maverick operated through a $2,000,000 revolving line of credit from Hillcrest Bank ("Hillcrest"). To secure the loan, Maverick pledged its inventory, which it reported to the bank on a monthly basis. In an attempt to improve profitability, Maverick decided to seek outside financing to purchase a sheeter.[12] In the course of applying for the second loan, Maverick discovered that its inventory was $2,000,000 less than what it had been reporting to Hillcrest. Hillcrest was furious when it learned of the erroneous reports. Hatch intervened and proposed that Maverick officers pledge certificates of deposit ("CDs") to restore the collateral. Hatch pledged CDs worth $700,000 and agreed to put a second mortgage on his house. Litton pledged a $25,000 CD, and other Maverick officers pledged CDs totaling $125,000. Hillcrest agreed to the plan but also required that Maverick pay down $450,000 of the loan balance every year and asked Maverick to hire a "legitimate" CFO.

In late 1999, Hatch began to focus Maverick's business on paper converting instead of paper distribution. Hatch encouraged Maverick employees to wait until its suppliers "squealed" before satisfying accounts payable. Maverick's suppliers responded by stopping shipments, which caused Maverick to lose customers. By that time, in addition to pledging $700,000 in CDs, Hatch had loaned Maverick a total of

---

[12]    The parties do not describe what a sheeter is.

11

$2.6 million.  For 1999, Maverick suffered operating loss of $344,451.[13]

In January of 2000, Maverick hired Larry Kibler to serve as CFO.  During that year, Maverick suffered $329,050 operating loss and $850,093 net loss.

### G.    Litton's Attempt To Sell Maverick Shares To Battenberg

On March 1, 2000, Litton wrote Battenberg, offering to sell his 11,582 shares in Maverick for $350,000 (more than $30.00 a share).  As part of the proposal, Litton wanted Battenberg to employ him at Maverick for 15 years at $15,271 per month.  In the letter, Litton stated as follows: [A]s you know, this is not the company that I envisioned managing, it is more what you had in mind. From a personal point of view, I do not care to own part of Maverick if I don't run it, but I think Maverick needs the business that I have today and other business that I can bring in if I devote time to it.

Defendants Exhibit 16.

Battenberg apparently did not respond.  More than a year later, on October 12, 2001, Litton wrote Hatch and Battenberg, stating as follows:

The subject of an exit plan for me that we discussed last April seems to be avoided.

JD, you have stated numerous times that you have had the desire to own and manage a converting company for many years.  You have also stated frequently that you want to be the one to buy me out.

The reasons that I want this taken care of are numerous:
    A.    I do not have a desire to run a production company.
    B.    I do not care to be a machine operator and maintenance man.
    C.    The personal philosophies I have are different than yours.
    D.    I see the amount of time and care that I dedicate to Maverick and feel that it is far greater than others.
    E.    I need more personal time to evaluate other opportunities.
    F.    If you want the business moved to you personally you need to start now.
    G.    I have disagreed from the beginning with the elimination of paper sales.

---

[13]    The amount of net loss for 1999 is not legible.  See Defendants Exhibit 1 and Plaintiffs Exhibit 10.

        H.        I have been at odds with you and Ralph over the Jagenberg purchase and installation and am frankly just tired of it.

I feel like Maverick is now in the right place at the right time to assume the majority of converting in the KC area.  If you want Maverick to continue to grow, you need to do it now.  If I am going to continue to be the one to secure business in the future and figure out how to make Maverick work, then I just want to know that, then I will figure out another plan with an outside party down the road.

        If you are or are not capable of doing this, I want to know by October 23.
        If you want to put together a plan to make it happen, great.  Then I want
        an outline of how to do it by November 2.

Plaintiffs Exhibit 11.

On November 2, 2001, Litton wrote Battenberg, stating that he had discussed with Hatch Battenberg's "reluctance to move forward."  Litton stated that Hatch had speculated that perhaps Battenberg was unsure how to structure an offer.  Litton opined that his interest in Maverick was worth the amount which he and his wife would earn in normal income over the next 15 years, $18,825 a month or $3,388,500 total.  He outlined a plan for payment and proposed that Battenberg make the payments to a company which he would set up.  On November 7, 2001, Battenberg responded by e-mail as follows:

I remain, as I have been from Maverick's inception, very interested in assuming management of the company and eventually owning it.

I recognize that you have given a lot of thought to defining the value you would like to realize from your investment of time, capital, and energy in Maverick over the past several years.

I would be willing to consider paying a fair financial value for the company, once the value of the business could be forecasted with some reliability.  However, as Maverick has been losing substantial amounts over the past several years, I believe it is premature to attempt to calculate an appropriate valuation for future net income.

Whatever our future communication regarding changes in share ownership, any formula proposed will require the approval of the Board.  It would also need to take into

consideration the input of other shareholders in the company. Therefore, I believe we must involve the Board in any and all future discussions, and must formally develop and review with them as per our Shareholders' Agreement any buyout formula.

Plaintiffs Exhibit 7.

### H.     Sherri Litton Views Pornography On Battenberg's Computer

In October, November or December of 2001, between 5:00 p.m. and 5:30 p.m., Sherri Litton entered Battenberg's office to ask a software question. Battenberg tried to open a computer program and pornographic images of nude women popped onto his computer screen for about two minutes. Sherri Litton did not discipline Battenberg nor did she document his personnel file regarding the incident. Under Maverick's policies and practices, when situations arose which required intervention, human resources typically reported the incident to the employee's supervisor, who would take appropriate action.

Sherri Litton reported the pornography to her husband, who was Battenberg's supervisor. Litton looked at the hard drive of Battenberg's computer and the computers of other employees and found that Battenberg's computer (and only Battenberg's computer) had been used to view pornography. Based on times of access and Battenberg's schedule, Litton concluded that Battenberg had been using the computer to access internet pornography. In investigating the incident, Litton did not ask Battenberg for an explanation, nor did he seek guidance from the employee handbook or anyone else.

### I.     2002 Budget And Litton's Efforts To Reduce Personal Income Taxes

On October 23, 2001, Litton wrote CFO Kibler, asking for ways to increase his tax basis in Maverick. Among other things, Litton asked Kibler to immediately review whether he could cash the $25,000 CD which he had pledged as collateral for Maverick and use the proceeds as a direct loan to Maverick.

14

Shortly thereafter, in November of 2001, Litton and Kibler began preparing a budget for 2002. During the budget process, Litton and Kibler typically discussed the budget and Kibler created a "pass" at the budget. When Litton and Kibler were satisfied with the pass, they presented it to Hatch, who made financial decisions for Maverick. During the process, Kibler usually prepared two or three different passes at the budget.

On November 21, 2001, Kibler prepared the first pass of the 2002 budget. It projected a loss of over $200,000 before payments totaling $450,000 under the work-out plan with Hillcrest. Including work-out payments, the first pass projected total net loss of $656,000. Hatch told Litton and Kibler that the first pass was unacceptable and asked them to develop alternatives.

On November 27, 2001, Litton e-mailed Kibler as follows:

> Go ahead and have . . . Hillcrest change over the CD as we discussed. Pay me out, then I loan Maverick the money to place in a new CD.
>
> I also want to look at delaying mine and Sherri's December paychecks until Jan. 2, 2002. I would guess to accrue them and fund them at the bank, but not issue them until Jan. 2.
>
> Also, I want to look at moving the amount that I will be owed at year end in expenses, to a loan to Maverick. Maverick pays me the expenses, and I then loan a similar amount back to Maverick, paid over the next 12 months. Then, for 2002, I will use the company AX credit card for the majority of business expenses.
>
> The last thing is more difficult, but I want to look at it to start in January 2002. I am thinking about setting up a partnership, Sherri and I, to have our compensation paid into instead of a paycheck. The dollar amount will be the same as our current compensation, plus the SS amount the company pays. This will allow us to make our daughters employees and then make college expenses deductible. This would most like [sic] require a contract between Maverick and the partnership to provide services. All taxes and FICA would be paid by the partnership and a 1099 would be issued at year end.

Plaintiffs Exhibit 4. Kibler printed the e-mail and made contemporaneous notes which indicated that

15

Litton's plan to employ his daughters "sounds like tax avoidance." Id.  Kibler also questioned whether the Littons could remain in Maverick's 401K and health insurance plans if they worked as independent contractors.

Kibler followed Litton's directions to convert the CD to a loan to Maverick.  In turn, Maverick used the proceeds to provide another CD for collateral on the Hillcrest loan.  As to compensation, Kibler told Litton that they needed an agreement between the new company and Maverick.  Litton asked Kibler to draft an agreement.  Kibler understood that the Littons intended to remain working in their current positions at Maverick for the same amount of compensation which they then received.

On December 10, 2001, Litton and Kibler proposed a second pass budget to Hatch.[14]  The second pass proposed changing the salary and commission structure of two sales people, including Battenberg, by cutting their base salaries and increasing sales commissions.  After receiving the second pass, Hatch called Kibler in frustration and complained that not much in the second pass had changed.

On December 20, 2001, Litton incorporated a new company called Paper Consulting & Design, LLC.  He prepared draft minutes for a meeting held January 1, 2002, which stated that officers were selected as follows: President and Treasurer, Ron Litton; Vice President and Secretary, Sherri Litton.  The draft minutes also reflected salaries for the Littons.  In fact, no board meeting was held and Litton did not tell Hatch about the new company.[15]

---

[14]      The second pass was the last proposed budget which contained input from Litton.

[15]      In the past, Litton had discussed with Hatch his need to look for other business opportunities and perhaps set up another corporation.

16

On January 2, 2002, Kibler faxed Hatch three budget alternatives.[16]  The first alternative reflected the amount of loss projected under second pass budget.  The second alternative proposed terminating the employment of Litton, Sherri Litton and Bill Snyder, the converting manager, because they were not a "positive contribution" to the company.  It also proposed cutting Armstrong's base salary to make him work solely for sales commissions.  The second alternative would result in a net loss of $218,263, but a savings of $340,000 over the first and second pass budgets.  The third alternative was the same as the second alternative, but it kept Litton employed at Maverick.  Kibler made the recommendations on his own, without any input from Hatch.  Kibler believed that Litton did not contribute to sales and had an overbearing style of management.

Later on January 2, 2002, after Kibler faxed the budget alternatives to Hatch, Kibler met Hatch at a pancake house to discuss the budget alternatives.  Kibler explained that (1) he could perform Sherri Litton's job; (2) he was not impressed with Litton's day-to-day contribution to Maverick; (3) Snyder was not contributing positively to Maverick; and (4) Maverick did not need an executive of Litton's "magnitude and salary."  Hatch did not want to fire Litton because he was afraid that Maverick would lose Hallmark business as a result.  Hatch told Kibler that he wanted to discuss the proposal with Litton, but that Kibler should plan on the third alternative, i.e. firing Sherri Litton and Snyder but keeping Litton.  Hatch and Kibler also discussed Battenberg's performance.  Kibler told Hatch that Battenberg was the person who kept Maverick going and that in addition to sales, Battenberg handled all operations problems.  Kibler also said that Battenberg made most of the sales calls for which Litton took credit.

_____

[16]    Kibler did not draft this document as part of the regular budget process and in drafting it, he did not include Litton.

Kibler created a document entitled "third pass" budget, dated January 7, 2002, which included Litton and Sherri Litton as employees and decreased the salaries of Battenberg and Armstrong.[17]  The third pass projected that Litton's accounts would generate $620,000 in rewinding business, $656,375 in logistics sales and $72,000 in sheeting accounts.  It projected that Battenberg's accounts would bring in $310,299 in rewinding business and $205,020 in sheeting business.

On the morning of January 9, 2002, Hatch met Litton at a Holiday Inn to discuss the budget.  Hatch stated that he wanted to leave Battenberg's salary alone, i.e. not decrease his base salary or increase his commissions.  Litton told Hatch that Sherri Litton had seen pornographic material on Battenberg's computer and that he had searched Battenberg's computer and found that he had visited pornographic web sites.  Litton gave Hatch a list of pornographic web sites and asked him to discuss the matter with Battenberg and resolve the situation.  The next day, Hatch asked Battenberg about the incident.  Battenberg explained that while Sherri Litton was in his office, a "cookie" unexpectedly popped up when he re-booted his computer.

## J.      The Littons Ask To Work As Independent Contractors

In the afternoon of January 9, 2002, Litton faxed Hatch a memorandum which stated as follows:

Beginning Jan. 1, 2002, I set myself and Sherri up as independent contractors instead of employees of Maverick.  I did that for two reasons, one is to take some tax advantage on the educational expenses for our kids.  Secondly, by being in the Maverick 401K program, I was going to make it have a top heavy situation which would have required Maverick to make a contribution to all employees of about 3% of payroll, which could be $30 to $40,000.

As you can see from the attached agreement that Larry believes we should have, there is no increase in mine or Sherri's compensation from Maverick.

---

[17]      Hatch does not recall seeing the document.  Kibler testified that as of January 7, 2002, Hatch had not yet decided whether to terminate the employment of either Litton.

18

> Larry felt that there should be an agreement between Maverick and us, so I asked him to look at one. It really does not matter to me if we do or not. I meant to discuss with you this morning [but] we ran out of time. Please advise or change as you need.

Defendants Exhibit 27. Attached to the fax was a draft personal services agreement between Maverick and Ron Litton LLC, which Kibler had prepared. The proposed agreement stated that Litton would serve as president of Maverick and Sherri Litton would serve as operations manager. It further provided that Maverick would pay the LLC $7,085 per month for Litton's services and $3,500 per month for Sherri Litton's services, plus a five per cent commission on GP/Hallmark sales.[18]

Prior to January 9, 2002, Litton had not told Hatch that he was thinking of forming a new company so that Maverick could pay him as an independent contractor. Hatch testified that when he received the fax, he felt startled and thought that Maverick's CEO was dumping it out of the blue, without warning and without a phone call. Hatch further testified that he called an emergency board meeting for January 11, 2002, to discuss the situation.

### K.      Maverick Board Removes Litton As CEO

On January 11, 2002, the board held a telephonic meeting.[19] According to its minutes, the board reviewed the existing employment contract with Litton, dated March 5, 1997, and removed his title of CEO

---

[18]      Although the record is not clear, it appears that Litton did not receive sales commissions under the executive employment agreement. The executive employment agreement provided a minimum base salary of $85,000 per year plus medical and group life insurance, participation in any pension or profit sharing plan available to employees and a company car with a gross purchase price up to $500 per month. See Defendants Exhibit 7.

The proposed personal services agreement defined "GP/Hallmark sales" as "the gross margin on all billings for Hallmark sheeting, all Eastern Tissue logistics billings, all Longview Paper logistics billings, and all Georgia Pacific billings for logistics and rewinding." Plaintiffs Exhibit 27.

[19]      Three members – Hatch, Williamson and Litton – comprised the board. Hatch and Williamson routinely out-voted Litton.

19

to bring the Agreement into compliance with Company bylaws which required that the Chairman be the CEO.[20]  Plaintiffs Exhibit 17.  It also reviewed the draft personal services agreement with Ron Litton LLC and directed Hatch to implement the agreement subject to review by tax counsel.  Finally, the board agreed that "Chairman Hatch needed to more clearly exercise the CEO role and initiate whatever restructuring, cost savings actions were, in his opinion, appropriate to improve financial results."  Id.  The minutes do not state that the board conducted the meeting on an emergency basis, that the board believed that the Littons had resigned their positions at Maverick, that the executive employment agreement with Litton was terminated or that the personal services agreement with Ron Litton LLC would replace the executive employment agreement with Litton.       After January 11, 2002, Hatch assumed the role of CEO of Maverick.  Before that time, he had not had engaged in day-to-day duties regarding management and operations of the company.

On January 13, 2002, Hatch sent Litton a letter which stated that although the shareholders agreement identified Hatch and Williamson as the only non-employees who could own Maverick stock, the board would grant Litton a special exception and permit him to continue holding shares.  On the same date, Hatch sent Litton another letter which stated that the board had approved compensating him and Sherri Litton through a new company, Paper Consulting & Design.  The letter stated that the board "understands that now you and Sherri are both working for the new LLC."  Defendants Exhibit 29.

L.    Hatch Decides To Fire Sherri Litton

Between January 12 and January 15, 2002, Hatch told Litton that he planned to discharge Sherri

---

[20]       Privately, board members questioned whether the employment agreement was still in effect if Litton was no longer a Maverick employee.

Litton.  On January 15, 2002, Sherri Litton sent Hatch a four-page single-spaced letter which expressed "concern, disagreement and shock" regarding his recent plan to cut costs.  Defendants Exhibit 30.  Sherri Litton acknowledged that it was "critical to make changes in our current operation to attain profitability" but stated that Hatch had based his plan solely on numbers and without understanding day-to-day operations, employees and what they did, and the personality of the company.  She further stated as follows:

> First and foremost, from an employee standpoint the oldest, largest and most constant problem has been J.D. Battenberg.  He has single handedly cost this company hundreds of thousands of dollars.  I am sure right about now you are thinking I am on the "Ron Litton band wagon."  I can only assure you that I am a freethinking independent individual with my own strong opinions that many times do not concur with Ron's. . . . I can also tell you with utmost confidence that the mass majority of the employees feel the same. * * *

> * * * J.D.'s reputation of disappearing for two or three hours and taking two and three hour lunches for years creates problems in maintaining a well ran [sic] and productive environment. * * * J.D. is considered a joke in the company, the mass resentment for the preferential treatment he has received is huge and he is looked upon as a slacker who does nothing to earn a paycheck. * * *

> Don't misunderstand, I do not presume that another individual cannot replace the job function I perform.  I certainly do not want to come across as some sort [of] braggart or sound as if I am irreplaceable.  Possibly even Larry could do my job function, he certainly is intelligent enough to do it but he would have to be willing to lower himself out of his castle to roll-up his sleeves and so some grunt work which he has not shown himself willing to do.

> * * * Most of my experiences with J.D. have been tolerable but never with respect and a few have been unacceptable.  I have experienced tantrums, screaming, yelling, hitting and throwing things and once his fisted hand raised to me.  I witnessed crying and erratic behavior.  I have experienced Internet pornography on his computer.  I have experienced pathological lying.  I have experienced denial; self interest and revenge toward others.  Some of these actions certainly have been cause for immediate dismissal and would have resulted with any other employee, especially another woman[,] in a legal action.

Id.  Only one sentence of the letter referred to the pornography incident with Battenberg, and Sherri Litton did not claim that her discharge was motivated by that incident.

21

**M.     Hatch Investigates Restructuring Plan And Pornography Incident**

For the board meeting on January 17, 2002, Hatch asked Litton to discuss his proposed restructuring plan and the pornography incident with Battenberg.  Before the meeting, Litton provided a list of topics for discussion.  The list referred to a potential age discrimination lawsuit regarding the termination of Bill Snyder (who was 60 years old) and a potential retaliation suit regarding the termination of Sherri Litton, based on the pornography incident with Battenberg.  See Defendants Exhibit 31L-M.  Regarding the "[movement of JD Battenberg to the position of converting manager," the list stated as follows:

1.     Previous failure in the position.
2.     Current failure in sales efforts.
3.     No penalty for previous failure and no penalty for current failure, compensation is not being changed to lower costs.
4.     Association with Ralph Spears, of Superior Systems to the detriment of Maverick Paper.  Maverick was terribly overcharged for the Jagenberg overhaul as well and JD and Ralph misrepresented the performance possibilities of the equipment and when it would perform.  Maverick actually took possession of the equipment in January of 1999.
5.     Investment in Cereal Ingredients, which can be construed as providing preferential treatment of job security over other employees and shareholders.  In addition, JD is the nephew of Bill Walsh, good friend, business associate and co-investor with Bob Hatch.
6.     Pornographic internet activity at the office, witnessed by a female.
7.     Ongoing personal distractions that have taken him away from Maverick for as much as 30 days at a time, and consistently continues.
8.     Refusal to account to the President for general whereabouts, sales reporting and sales planning for at least the last three years.
9.     Continued recommendation by the President, to the Chairman for dismissal or modification of compensation plan.
10.    Disrespected by the general employee population.
11.    Potential conflict of interest due to investment in CI by Battenberg resulting in preferential treatment within Maverick.

Defendants Exhibit 31L.

On January 17, 2002, the board met telephonically and Litton discussed his list of issues.  The

22

board agreed to pay Sherri Litton $7,500 if "both the company and Sherri Litton agree to cooperate fully with each other and to refrain from any sort of disparagement regarding the other." Defendants Exhibit 31G. The board's proposed letter to Sherri Litton stated that the payments "are not severance checks (since you are not a Maverick employee) but a token of our appreciation of your efforts and past association with us." Id. The board also reviewed a revised personal services agreement with Ron Litton LLC. See Defendants Exhibit 31H. The proposed agreement stated that beginning January 16, 2002, Ron Litton LLC would provide the following services: maintain "GP/Hallmark sales," grow "GP/Hallmark business" and bring new logistics and conversion business to Maverick. Id.

After the meeting, Hatch asked Battenberg to provide a written response to each allegation on Litton's list of topics. Two days later, on Saturday, January 19, 2002, Battenberg faxed a three-page, single-spaced letter. With regard to the pornography incident, Battenberg explained as follows:

> I have never visited pornographic web-sites at the office or at home. On the one occasion observed by Sherri Litton, I opened internet [sic] on my computer at her request, and the internet opened with a "cookie" or inset advertisement for a pornographic web-site. I did not then, and have never, visited such web-sites, and if my computer was used to do so, it was done by someone other than myself on my then unsecured computer in my accessible office (there is no lock available on my door). Sherri joked at the time that she had had similar experiences on her computer, and that other previous employees of Maverick had visited these advertised web sites on a regular basis while employed by Maverick, with both Ron and her knowledge.

Defendants Exhibit 32 (emphasis in original).

The next day, Sunday, January 20, 2002, Hatch and Battenberg discussed Battenberg's responses for several hours. That evening, Hatch called Litton and told him that he had received a response from

Battenberg and that he was going forward with the reorganization as planned.[21]  The same day, Hatch sent Sherri Litton a thank-you letter and a check for $7,500.00.

**N.      Hatch Implements Part Of Restructuring Plan**

Hatch promoted Battenberg to Vice President of Operations.  In that position, Battenberg assumed many human resources duties which Sherri Litton had performed.  Battenberg also became responsible for building maintenance and work safety programs.  Other employees also assumed duties which Sherri Litton had performed: Kibler assumed payroll and accounts receivable duties and Snyder became responsible for plant staffing.  Although the plan which Hatch had endorsed called for discharging Snyder and converting Armstrong's pay to commissions only, Hatch did not take those actions.  Hatch testified that he did not fire Snyder because Battenberg objected that it would result in other employees bearing too much work.

**O.      Personal Services Agreement Between Maverick And Ron Litton LLC**

On January 22, 2002, Maverick and Ron Litton LLC entered into a personal services agreement under which Ron Litton LLC would provide services regarding maintenance of GP/Hallmark business, growing GP/Hallmark business and bringing in new and conversion business to Maverick.  Hatch told Litton that he was tired of talking about changes to the agreement and that Litton had to "sign it or else."  Litton understood that Hatch would fire him if he did not sign the agreement.  The final agreement contains certain terms which Hatch proposed and which differed from the first draft which Litton had proposed.  Litton's original intent was to retain the same terms as the executive employment agreement.  In discussions with Hatch, however, he never expressed any belief that the original executive employment agreement was still

---

[21]      On this record, it appears that Hatch was referring to the third budget alternative which Kibler proposed on January 2, 2002, i.e. terminating the employment of Sherri Litton and Snyder and cutting Armstrong's base salary to commissions only.

24

in effect.

The final personal services agreement did not state a job title for Litton, and he understood it to be a demotion from president to salesperson for less pay.  The final agreement provided a different compensation scheme which included a higher base salary but made it more difficult to earn commissions. Specifically, as to compensation in 2002, the final agreement stated as follows:

1)    A monthly lump sum fee of $9,000 for each month in 2002 that Maverick's total invoices for GP/Hallmark sales are maintained and achieve or exceed the comparable month in Maverick fiscal year 2001.

2)    For growth above the 2001 invoice level for GP/Hallmark sales, if any, Litton will receive a commission of 5% for that portion above 2001.  This commission will be paid monthly.

3)    For approved, completely new conversion business to Maverick secured by Litton, the LLC will receive a 7% commission for the first 12 months of new business.  This commission will be paid monthly.

Defendants Exhibit 34.

For compensation in future years, the agreement provided as follows:

1)    The monthly lump sum for maintenance of GP/Hallmark sales will be maintained at $9,000 and calculated against the immediately preceding year in the same manner as 2002.

!    Sales growth, if any, above the level of the 2001 year will continue to earn a 5% commission, paid monthly.

!    In the event of sales decline from the preceding year, the flat fee will be reduced proportionately.

2)    Commissions on completely new business will be 7% for the first 12 months; 5% on the annual growth over the previous 12 months, and 3% on the balance or base. Commissions, if any, will be paid monthly.

Id.

As to the parties' relationship, the agreement stated as follows:

a.    It is understood by the parties that Litton is an independent contractor with respect to Maverick, and not an employee of Maverick.

25

      b.      It is understood by the parties that as long as Litton is receiving compensation from Maverick, Litton or employees of Litton will not engage in business directly or indirectly competitive with Maverick.

      c.      Litton will be responsible for its own health or other insurance.

Id.  The agreement provided that it superceded any prior written or oral agreements between the parties and that either party could terminate it upon 90 days written notice to the other party.  Id. ¶¶ 5, 8.  Litton signed the agreement on behalf of "Litton, LLC."  In fact, however, Litton did not incorporate an entity called "Ron Litton LLC" or "Litton, LLC."

The personal services agreement did not refer to the executive employment agreement between Litton and Maverick.

For seven months, between January 22 and August 22, 2002, Litton continued to work regular hours at Maverick.  During this time, his accounts generated $758,892.55 in sales, including $162,588.97 in new business.  In addition, he secured one new customer, Longview Fiber, which generated sales of $22,292.88 over five months.  Despite his title change, Maverick employees continued to regard Litton as an authority figure.

**P.    Kibler Devalues Maverick Stock To $.01 Per Share**

On July 2, 2002, Kibler valued Maverick stock at $.01 a share.  According to Kibler, he based the valuation on the following facts: (1) the company had a negative net worth of $3,600,000; (2) the company had negative cash flows for 2000 and 2001 and a projected negative cash flow for 2002; and (3) the company owed Hatch $2,692,000 plus interest.  On August 22, 2002, the board, which included Litton, unanimously approved the valuation.

**Q.    Hatch Terminates Personal Services Agreement With Litton After Discussing Potential Lawsuit By Sherri Litton**

On August 23, 2002, Hatch and Litton met to discuss a potential retaliation suit by Sherri Litton.[22] At the end of the meeting, Hatch expressed frustration and said that he was going to terminate Litton's personal services agreement.  That afternoon, Hatch faxed Litton a letter which provided written notice of termination of his personal services agreement with Maverick.

The day before, on August 22, 2002, the board had given Litton permission to continue negotiating a high dollar deal concerning the acquisition of Sea-Pak.  Hatch viewed the acquisition as a major opportunity for Maverick.  The board did not discuss Litton's job performance.  The same day, Hatch had faxed information to Williamson which indicated that Litton had information to pass on regarding Sea-Pak.

On September 10, 2002, the board – comprised of Hatch, Williamson and Litton – met and reviewed the termination letter which Hatch had faxed Litton on August 23, 2002.  The board endorsed the letter over Litton's objection.

### R.      Maverick Employment Policies

Maverick employment rules expressly prohibit possessing pornography and using company computers for personal business.

Sherri Litton developed Maverick's employee manual, and Litton signed the introductory page as president.  The manual stated that Maverick would not take adverse employment action against an employee who in good faith reported harassment.  It also stated that "I further understand that my employment is terminable at-will by either myself or Maverick" and that "I understand that no contract of employment other than at-will has been expressed or implied and that no circumstances arising out of my relationship will alter my at-will employment relationship unless expressed in writing, with the understanding

---

[22]      According to Hatch, the purpose of the meeting was to review Litton's job performance.

specifically set forth and signed by myself and the President of Maverick Paper."

The manual also provided a list of certain occurrences, including willful violation of any company rule, which "may result in immediate dismissal without warning."  Plaintiffs Exhibit 51 at 28-29.  It provided another list of occurrences, including unsatisfactory or careless work, which "may be subject to disciplinary action, including possible immediate dismissal."  The manual further provided that "[t]his list is not all-inclusive and, notwithstanding this list, all employees remain employed 'at will.'"  Id. at 29-30.  For infractions which did not result in immediate dismissal,  the manual provided a three-step discipline process which involved verbal warning, written warning and dismissal.  See id. at 30-31.  With respect to discipline, the manual stated as follows:

> This policy pertains to matters of conduct as well as the employee's competence. However, an employee who does not display satisfactory performance and accomplishment on the job may be dismissed, in certain cases, without resorting to the steps set forth in this policy.
>
> Under normal circumstances, managers are expected to follow the three-step procedure outlined below.  There may be particular situations, however, in which the seriousness of the offense justifies the omission of one or more of the steps in the procedure.  Likewise, there may be times when the company may decide to repeat a disciplinary step.
>
> *        *        *
>
> Employment and compensation with Maverick Paper is "at  will" in that they can be terminated with or without cause, and with or without notice, at any time, at the option of either Maverick or yourself, except as otherwise provided by law.
>
> If your performance is unsatisfactory due to lack of ability, failure to abide by company rules or failure to fulfill the requirements of your job, you will be notified of the problem. If satisfactory change does not occur, you may be dismissed.  Some incidents may result in immediate dismissal.

Id. at 30-31.

The shareholders agreement required that Maverick stock be valued annually.  Such valuations,

however, were not performed uniformly or annually.  Although businesses can be valued in many ways, the typical business valuation attempts to represent the investment value of a company to a new owner.

Maverick has offered to redeem plaintiffs' stock at $.01 per share.

## II.     Analysis

As noted, in light of the Court's order of January 28, 2005 (Doc. #66), the following claims remain in the case:

A.     Sherri Litton's claims against Maverick for discrimination and retaliation under Title VII (Counts I and II);

B.     Ron Litton's claims against Maverick for retaliation under Title VII (Count III);

C.     Ron Litton's claims against Maverick for breach of the executive employment agreement (Count IV);

D.     Ron Litton's claims against Maverick for breach of the personal services agreement (Count V);

E.     Sherri Litton and Ron Litton's claims against Maverick for breach of implied contract (Count VIII);

F.     Sherri Litton and Ron Litton's claims against all defendants for breach of the shareholders agreement (Count IX);

G.     Ron Litton's claims against all defendants for breach of demand notes (Count X);

H.     Sherri Litton and Ron Litton's claims against all defendants for tortious breach of duty of good faith and fair dealing (Count XI);

I.     Sherri Litton and Ron Litton's claims against all defendants for constructive fraud

(Count XII);

J.    Sherri Litton and Ron Litton's claims against Hatch and Williamson for breach of

fiduciary duty (Count XIII); and

K.    Ron Litton's claim against Hatch for fraudulent misrepresentation (Count XIV).

Defendants seek summary judgment on all claims.

**A.    Sherri Litton's Claim For Employment Discrimination Under Title VII (Count I).**

Sherri Litton claims that Maverick subjected her to a hostile work environment based on sex.[23]

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer .

. . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges

of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §

2000e-2(a)(1).  Plaintiff may establish a Title VII violation by proving that discrimination based on sex

created a "hostile or abusive work environment." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66

(1986).  To establish a prima facie case of hostile work environment under Title VII, plaintiff must show

that: (1) she is a member of a protected class; (2) the conduct in question was unwelcome; (3) the

harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to create an abusive

working environment; and (5) some basis exists for imputing liability to the employer. Brandau v. State of

Kan., 968 F. Supp. 1416, 1420 (D. Kan. 1997).

Defendants assert that plaintiff cannot show that the alleged harassment was sufficiently severe or

pervasive to create an abusive working environment.  To prevail, plaintiff must present evidence sufficient

_____

[23]    Sherri Litton has abandoned her claim for disparate treatment under Title VII. See
Plaintiffs' Response at 69.

30

to support a jury finding that the alleged conduct had the purpose or effect of unreasonably interfering with her work performance or created an intimidating, hostile or offensive working environment. <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993). In determining whether such an environment existed, the Court looks at the totality of the circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Id.</u>; <u>see</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998). The Court evaluates these factors from both a subjective and an objective viewpoint. <u>Harris</u>, 510 U.S. at 21. In so doing, the Court considers both the effect which the discriminatory conduct actually had on plaintiff and the impact which it likely would have had on a reasonable employee in plaintiff's position. <u>See</u> <u>Davis v. U.S. Postal Serv.</u>, 142 F.3d 1334, 1341 (10th Cir. 1998).

Defendants argue that as a matter of law, the one incident in which Sherri Litton viewed pornography on Battenberg's computer is not sufficient to create a hostile work environment. Plaintiff agrees, <u>see</u> <u>Plaintiffs' Response</u> at 115, but argues that Battenberg engaged in other acts which, taken together, amount to sexual harassment. Specifically, plaintiff contends that Battenberg engaged in tantrums, screamed, yelled, hit, threw things and raised his fist to her. In support of these assertions, plaintiff cites her letter to Hatch dated January 15, 2002, which stated as follows:

> * * * I have experienced tantrums, screaming, yelling, hitting and throwing things and once his fisted hand raised to me. I witnessed crying and erratic behavior. I have experienced Internet pornography on his computer. I have experienced pathological lying. I have experienced denial; self interest and revenge toward others. Some of these actions certainly have been cause for immediate dismissal and would have resulted with any other employee, especially another woman[,] in a legal action. * * *

31

Defendants Exhibit 30.

As an initial matter, the letter is not sworn and does not constitute evidence sufficient to overcome summary judgment under Rule 56(c) and (e), Fed. R. Civ. P.  Moreover, even if the Court considered the letter, it provides no information regarding the frequency of the conduct; its severity, whether it was objectively threatening or humiliating, or whether it unreasonably interfered with plaintiff's work performance.  On this record, plaintiff has not produced evidence sufficient to create a triable issue whether the alleged conduct was sufficiently severe or pervasive to create a hostile work environment.  See, e.g., Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir. 2005) (plaintiff cannot show racial harassment with few isolated incidents of racial enmity or sporadic racial slurs; must show steady barrage of opprobrious racial comments) (quoting Hicks v. Gates Rubber Co., 833 F.2d 1406, 1412-13 (10th Cir. 1987)); Metzger v City of Leawood, 144 F. Supp.2d 1225, 1246 (D. Kan. 2001) (sporadic and unrelated incidents do not satisfy frequency test).  Maverick is therefore entitled to summary judgment on Sherri Litton's claim for sexual harassment employment discrimination (Count I).

## B.    Sherri Litton's Claim For Retaliation Under Title VII (Count II).

Sherri Litton claims that Maverick discharged her in retaliation for engaging in protected activity, i.e. reporting the pornography incident with Battenberg.  Defendant asserts that plaintiff cannot assert a Title VII claim because at the time of her discharge, she worked as an independent contractor and not an employee.  Defendant also argues that plaintiff cannot establish a prima facie case or pretext.

### 1.    Whether Sherri Litton Worked As An Independent Contractor

Defendant asserts that Sherri Litton cannot prevail because at the time of discharge, she worked as an independent contractor and not an employee.  Title VII prohibits an employer from

32

discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  It defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees," id. § 2000e(b), and an employee as "an individual employed by an employer."  Id. § 2000e(f).  Under this statutory framework, in order to establish a prima facie case under Title VII, plaintiff must prove that she was an employee of Maverick.  See Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1069 (10th Cir. 1998).

Defendant argues that at the time of discharge, Sherri Litton worked as an independent contractor. In determining whether plaintiff was an employee for Title VII purposes, the Tenth Circuit has endorsed a hybrid analysis which combines the economic-realities test with the common law right-to-control test.  See Lambertsen v. Utah Dep't of Corr., 79 F.3d 1024, 1028 (10th Cir. 1996).  Under this approach, the Court considers the economic realities of the working relationship with a particular focus on the employer's right to control the "means and manner" of plaintiff's performance.  Oestman v. Nat'l Farmers Union Ins. Co., 958 F.2d 303, 305 (10th Cir. 1992) (quoting Spirides v. Reinhardt, 613 F.2d 826, 831 (D.C. Cir. 1979)). The Court also considers the following factors:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer;" (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

Id. (quoting Spirides, 613 F.2d at 832).  No single factor is determinative.  Oestman, 958 F.2d at 305.

Rather, the Court considers the totality of circumstances surrounding the working relationship.  Id.

To support its contention that Sherri Litton worked as an independent contractor, defendant relies

solely on Litton's letter to Hatch dated January 9, 2002.  Litton's letter stated that beginning January 1, he

had arranged for himself and Sherri Litton to work as independent contractors instead of employees.  This

self-declaration, however, sheds no light on relevant facts such as whether Maverick had the right to control

the "means and manner" of plaintiff's performance.  Id. (quoting Spirides, 613 F.2d at 831).  Construed

in the light most favorable to plaintiff, the record supports an inference that Sherri Litton wanted to work

as an independent contractor for tax purposes only, and not to materially change the working relationship.

Moreover, the record contains no evidence that short of terminating her employment, Maverick took any

steps to change its working relationship with her.  On this record, defendant has not conclusively shown that

for purposes of Title VII, Sherri Litton was an independent contractor at the time of her discharge.

### 2.    Prima Facie Case And Pretext

Defendant asserts that plaintiff cannot establish a prima facie case or pretext.  To make a

prima facie case of retaliation under Title VII, plaintiff must show that (1) she engaged in protected activity;

(2) she suffered an adverse employment action; and (3) a causal connection exists between the protected

activity and the adverse employment action.  O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1258 (10th

Cir. 2001).  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a

nondiscriminatory reason for the adverse employment action.  Selenke v. Med. Imaging of Colo., 248 F.3d

1249, 1264 (10th Cir. 2001).  If defendant satisfies this burden of production, then, in order to prevail,

plaintiff must prove that defendant's articulated reason for the adverse action is pretextual, i.e. unworthy of

belief.  Id.

Defendant argues that plaintiff cannot show a causal connection between her report of the pornography incident and her discharge.  Specifically, defendant argues that no causal connection exists because Hatch considered terminating plaintiff's employment on January 2, 2002, a week before Ron Litton told him about the pornography incident.[24]  On January 2, 2002, Kibler gave Hatch three budget alternatives, two of which proposed terminating Sherri Litton's employment.  Hatch told Kibler to plan on the third alternative, which proposed firing Sherri Litton and Snyder and converting Armstrong's salary to commissions.  Construed in the light most favorable to plaintiff, the record indicates that Hatch's budget decisions fluctuated after he made this statement[25] and that Hatch did not make a final decision to fire Sherri Litton until January 20, 2002, eleven days after he learned from Litton that Sherri Litton had reported the pornography incident.  The Tenth Circuit has held that for purposes of establishing a prima facie case, a one and one-half month period between protected activity and adverse action may, by itself, establish causation. See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).  Here, plaintiff alleges that Hatch learned of her complaint on January 9, 2002 and fired her on January 20, 2002.  For purposes of plaintiff's prima facie case, this temporal proximity is sufficient to establish a genuine issue of material fact regarding causation.  See id.

Defendant contends that it fired plaintiff as a result of its reorganization plan.  Because defendant articulates a facially neutral reason for its action, the burden shifts to plaintiff to establish pretext.  To

_____

[24]      Although Hatch was not involved in day-to-day operations at this time, he made financial decisions for Maverick.

[25]      On January 13, 2002, Hatch informed the Littons that the board had approved compensating them both through their new company, Paper Consulting & Design, LLC.

establish pretext, plaintiff must show that "a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." Texas Dep't of Comm. Affairs v. Burdine, 450 U.S.248, 256 (1981). A particular plaintiff can accomplish this by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (quotation and citation omitted). However, mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment. Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988).

Plaintiff asserts that defendant's articulated reason is unworthy of credence due to inconsistencies and contradictions. Specifically, she asserts that (1) because she was the lowest paid  manager, firing her would have the least impact on the company's bottom line; (2) Maverick needed more sales to be profitable and it did not terminate or demote salespeople; (3) the reorganization plan proposed terminating Snyder and placing Armstrong on straight commission but Maverick did not do so; (4) the Littons' withdrawal from the 401K plan saved Maverick an amount of money equal to her salary; (5) Hatch did not begin a cost-cutting plan until January 14, 2002; and (6) the third pass budget dated January 7, 2002 included her salary.

When evaluating pretext, the relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether the employer honestly believed those reasons and acted in good faith upon those beliefs. Stover v. Martinez, 382 F.3d 1064, 1076 (10th Cir. 2004); Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1318 (10th Cir. 1999), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002). Close temporal proximity between the employee's protected activity

36

and the adverse employment action is a factor in determining whether the employer's proffered reason is a pretext for retaliation.  See Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir. 2000) (citing Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 551 (10th Cir. 1999) and Butler v. City of Prairie Village, Kan., 172 F.3d 736, 752 (10th Cir. 1999)).  The Court's role is to prevent unlawful hiring practices, not to second guess employers' business judgments.  See Simms v. Okla., 165 F.3d 1321, 1329 (10th Cir. 1999).

The fact that Maverick could have saved more money by firing other people or making other budget decisions does not tend to show that defendant's stated reason for termination is unworthy of credence. On the other hand, the fact that Maverick did not follow the other steps of its reorganization plan, i.e. firing Snyder and converting Armstrong to solely commission pay, casts doubt on the veracity of its statement that it fired plaintiff in accordance with such plan.  This evidence, along with the temporal proximity of Hatch's decision to fire Sherri Litton eleven days after he learned that she had reported the pornography incident, is sufficient to raise a fact issue as to whether defendant's stated reason for the termination is pretextual. See Pastran 210 F.3d at 1206.  Maverick is not entitled to summary judgment on Sherri Litton's claim that it discharged her in retaliation for reporting the pornography incident with Battenberg.

## C. Litton's Claim For Retaliation Under Title VII (Count III).

Litton claims that Maverick demoted him in retaliation for investigating the pornography incident and fired him because he discussed Sherri Litton's potential discrimination lawsuit.  See Pretrial Order (Doc. #89) at 63.  Defendant asserts that Litton cannot assert a Title VII claim because he worked as an independent contractor and not an employee.  Defendant also argues that Litton cannot establish a prima

facie case or pretext on his claim for retaliatory demotion.[26]

### 1.     Whether Litton Worked As An Independent Contractor

As to whether Litton worked as an independent contractor, the Court applies the same analysis regarding Sherri Litton's status as an employee versus independent contractor.  To support its contention that Litton worked as an independent contractor, defendant again relies solely on his letter of January 9, 2002, which stated that beginning January 1, he and Sherri Litton had arranged to work as independent contractors instead of employees.  Such self-declaration sheds no light on relevant facts such as whether Maverick had the right to control the "means and manner" of plaintiff's performance.  Oestman, 958 F.2d at 305 (quoting Spirides, 613 F.2d at 831).  Defendant has not conclusively shown that Litton worked an independent contractor for purposes of Title VII.

### 2.     Prima Facie Case And Pretext On Retaliatory Demotion Claim

Defendant argues that Litton cannot show a causal connection between his investigation of the pornography incident and his demotion to salesperson.  Construed in the light most favorable to plaintiff, the record shows that Hatch learned about the pornography investigation on January 9, 2002, and decided to demote Litton within 2 days later, on January 11, 2002, when the board removed his title of CEO and authorized Hatch to execute a revised personal services agreement with Litton.  See Plaintiffs Exhibit 17 at 2.  For purposes of plaintiff's prima facie case, this temporal proximity raises a genuine issue of material fact as to causation.  See Anderson, 181 F.3d at 1179.

Defendant states that it demoted plaintiff because it felt slighted by his "secret resignation."

---

[26]     Defendant does not argue that Litton cannot establish a prima facie case or pretext on his claim of retaliatory discharge.  See Defendants' Memorandum at 42-43, 45.  That claim therefore remains in the case.

Specifically, defendant contends that "it felt that Mr. Litton had gone behind Maverick's back and made a monumental decision, affecting the entire organization, without so much as asking for approval from the Board" and that "Maverick was not going to allow Mr. Litton to continue as President and CEO when he had unilaterally chosen not to be its employee." Defendants' Memorandum at 43. Because defendant articulates facially neutral reasons for its action, the burden shifts to plaintiff to establish pretext.

Litton asserts that defendant's articulated reason is implausible. Specifically, plaintiff asserts that Kibler knew that he was setting up an LLC to receive his pay and that the move was not a "surprise" to Maverick. Construed in the light most favorable to plaintiff, the record does support an inference that plaintiff intended to set himself up as an independent contractor for tax purposes only and that he did not intend to materially change the working relationship. On the other hand, the undisputed evidence is that Hatch, who was chairman of the board, did not find out about the plan until January 9, 2002, when he received the fax from Litton which discussed the change as a done deal effective January 1, 2002. Hatch could have been understandably shocked and surprised by the letter – especially in light of the executive employment agreement, which prohibited Litton from directly or indirectly engaging in any other business in any capacity, without the prior written consent of Maverick.

These facts present a close case. The undisputed evidence is that Hatch had a quick and negative reaction to the news which he learned on January 9, 2002. Within two days, by the Board meeting on January 11, 2002, he had decided to demote Litton. The reason for Hatch's decision – i.e. whether it was because Litton had investigated pornography or because Litton wanted to work as an independent contractor, or both – boils down to a credibility determination. Moreover, the minutes of the board meeting state that the board removed Litton's title of CEO in order to conform with company by-laws. See

39

Plaintiffs Exhibit 17 at 1.  In support of summary judgment, however, defendant asserts that it demoted Litton because it felt slighted by his decision to work as an independent contractor.  Whether this shift in explanation demonstrates pretext is a question for the jury.  See, e.g., Brimm v. Bldg. Erection Servs. Co., 311 F. Supp.2d 1231, 1241 (D. Kan. 2004).  In order to prevail, plaintiff need only show that retaliation was a motivating factor in defendant's decision, i.e. that defendant acted at least in part because plaintiff investigated the pornography incident.  See Luse v. Henderson, 68 F. Supp.2d 1217, 1223 (D. Kan. 1999).  On this record, a genuine issue of material fact exists in this regard.  Maverick is not entitled to summary judgment on Litton's retaliatory demotion claim.

### D.      Litton's Claim For Breach Of Executive Employment Agreement (Count IV)

Litton claims that Maverick owes him severance payments under the executive employment agreement because it terminated his employment as president without cause and demoted him to salesman. See Pretrial Order (Doc. #89) at 30-31.  Maverick asserts that it does not owe severance payments because Litton voluntarily terminated the agreement.  The executive employment agreement provided that Maverick could terminate the agreement with or without cause, subject to severance payments to Litton, depending on the circumstances of termination.  See Plaintiffs Exhibit 32, ¶ 6.  The agreement, however, contained no such provision in the event Litton terminated the agreement.  See id.  Thus, if Litton voluntarily terminated the agreement, Maverick did not owe severance payments thereunder.

Maverick argues that Litton voluntarily terminated the executive employment agreement when he "clearly and unmistakenly" announced his resignation by facsimile on January 9, 2002.  Defendants' Memorandum at 46.  On January 9, 2002, Litton faxed Hatch a memorandum which stated as follows:

Beginning Jan. 1, 2002, I set myself and Sherri up as independent contractors instead of

40

employees of Maverick. I did that for two reasons, one is to take some tax advantage on the educational expenses for our kids. Secondly, by being in the Maverick 401K program, I was going to make it have a top heavy situation which would have required Maverick to make a contribution to all employees of about 3% of payroll, which could be $30 to $40,000.

As you can see from the attached agreement that Larry believes we should have, there is no increase in mine or Sherri's compensation from Maverick.

Larry felt that there should be an agreement between Maverick and us, so I asked him to look at one. It really does not matter to me if we do or not. I meant to discuss with you this morning [but] we ran out of time. Please advise or change as you need.

Defendants Exhibit 27.

Litton disputes that the facsimile constituted his resignation. Specifically, he asserts that Maverick knew that he had no intention of resigning because weeks earlier, he told Kibler that his only reason for creating the LLC was to realize personal tax benefits and to relieve Maverick of a potential 401K penalty. As discussed supra, the Court cannot find as a matter of law that Litton's self-declaration that he was an independent contractor made it so. Indeed, Litton continued to perform services for Maverick before January 16, 2002, when the parties formalized his status as an independent contractor under the personal services agreement. Moreover, two days after the facsimile, on January 11, 2002, Maverick's board reviewed the executive employment agreement and removed Litton's title of CEO to bring the agreement into compliance with company bylaws. Construed in the light most favorable to plaintiff, these facts support an inference that the executive employment agreement continued in effect for some period after plaintiff's facsimile of January 9, 2002.

Maverick contends that Litton voluntarily terminated the executive employment agreement when he signed the personal services agreement. Specifically, Maverick argues that the executive employment

41

agreement provided that it could be modified by a subsequent writing between the parties, and the personal services agreement states that it "supercedes any prior written or oral agreements between the parties." Defendants Exhibit 34.

Litton responds that the personal services agreement did not supercede the executive employment agreement because the two agreements were not executed by the same parties. Specifically, he argues that the executive employment agreement was between Maverick and Ron Litton, individually, while the personal services agreement was between Maverick and Ron Litton LLC. Plaintiff's argument is problematic in several respects. First, Litton does not explain how the two agreements could exist simultaneously, i.e. how he could work directly for Maverick under the executive employment agreement and at the same time work as an independent contractor through Ron Litton LLC under the personal services agreement. Moreover, although Litton signed the personal services agreement as a principal of Ron Litton LLC, he never formed such an entity. See K.S.A. § 17-7605 (LLC formed by executing and filing articles of organization with secretary of state). Because Ron Litton LLC never actually existed, Litton was personally liable under the personal services agreement. See K.S.A. § 17-7621 (all persons who assume to act as LLC without authority to do so jointly and severally liable for all debts and liabilities). Accordingly, the agreements are not between different parties and, by signing the personal services agreement, Litton terminated the executive employment agreement.

Litton argues that Hatch forced him to sign the personal services agreement and that the personal services agreement should be considered an adhesion contract and construed against Maverick, its drafter. Construed in the light most favorable to plaintiff, the record indicates that Hatch threatened to fire Litton if he did not sign the personal services agreement. Such a threat, however, does not demonstrate that Litton

signed the personal services agreement under duress. See, e.g., Cooper v. MRM Invest. Co., 367 F.3d 493, 505 (6th Cir. 2004) (threat to terminate employment if employee did not sign arbitration agreement did not constitute duress). The undisputed facts are that Litton asked to change his employment status to independent contractor. The fact that terms of the final personal services agreement varied from that which Litton originally proposed does not create a genuine issue of material fact as to the voluntariness of the transaction.[27] Litton argues that he received no consideration for the benefits which he forfeited under the executive employment agreement. This argument ignores the fact that he gained the status of an independent contractor, which he believed would benefit him financially for tax purposes. On this record, Litton has not demonstrated a genuine issue of material fact whether Maverick is liable for severance payments under the executive employment agreement.[28] Maverick is entitled to summary judgment on Litton's claim for breach of the executive employment agreement.

E.     Litton's Claim For Breach Of Personal Services Agreement (Count V)

Litton claims that Maverick terminated the personal services agreement in violation of its terms and the covenant of good faith and fair dealing. See Pretrial Order (Doc. #89) at 30-32. Maverick asserts that plaintiff cannot prove his claims. The Court agrees. The personal services agreement provided that it could be "terminated by either party upon 90 days written notice to the other party." Plaintiffs Exhibit 46 ¶ 5.

_____

[27]     Litton argues that he did not think a personal services agreement was necessary to change his status to independent contractor. Even so, Litton chose to change his status even after he knew that Maverick wanted a new agreement.

[28]     In response to defendants' summary judgment motion, Litton argues that Hatch violated the covenant of good faith and fair dealing which was inherent in the executive employment agreement. See Plaintiffs' Response at 138-39. The pretrial order does not assert such a claim, see Pretrial Order (Doc. #89) at 29-30, and the Court does not consider it herein. See D. Kan. Rule 16.2(c) (pretrial order will control subsequent course of action).

It imposed no other conditions on termination and therefore could be terminated with or without cause.

Under Kansas law, an employment contract that can be terminated without cause does not imply a duty of

good faith and fair dealing.  See St. Catherine Hosp. of Garden City v. Rodriguez, 25 Kan. App.2d 763,

765-66, 971 P.2d 754, 756 (1998).  Litton has not shown that Maverick breached any term of the

personal services agreement or an implied duty of good faith and fair dealing.[29]  Maverick is entitled to

summary judgment on plaintiff's claim for breach of the personal services agreement.

### F.    Breach Of Implied Contract (Count VIII)

The Littons allege that Maverick breached implied contracts of employment by demoting and/or

terminating their employment.[30]  Kansas law presumes employment to be at will, see Inscho v. Exide Corp.,

29 Kan. App.2d 892, 865, 33 P.3d 249, 252 (2001); however, it will imply a contract of employment if

facts and circumstances show mutual intent to contract.  Kastner v. Blue Cross & Blue Shield of Kan., Inc.,

21 Kan. App.2d 16, 23, 894 P.2d 909, 915 (1995) (citing Allegri v. Providence-St. Margaret Health Ctr.,

9 Kan. App.2d 659, 663, 684 P.2d 1031, 1035 (1984)).  The parties' intent is normally a question of fact

for the jury.  Morriss v. Coleman Co., 241 Kan. 501, 512, 738 P.2d 841, 848 (1987) (citing Allegri, 9

Kan. App.2d at 663, 738 P.2d at 1035).  Relevant factors include (1) the understanding and intent of the

---

[29]    In response to defendants' summary judgment motion, Litton argues that the personal services agreement is invalid because he signed it under duress and without consideration.  See Plaintiffs' Response at 136-38.  Plaintiff does not assert such a claim in the pretrial order and the Court does not consider it herein.  Moreover, as discussed supra, a threat to terminate one's employment generally is insufficient to show duress.  See, e.g., Cooper, 367 F.3d at 505.

[30]    In the pretrial order, plaintiffs allege that Maverick also breached implied contracts by manipulating share values and engaging in harassment and retaliatory actions.  See Pretrial Order (Doc. #89) at 33.  In response to the summary judgment motion, plaintiffs make no attempt to establish such claims.  See Plaintiffs' Response at 140-41.  The Court therefore deems the claims waived.

parties, which are ascertainable from written and oral negotiations; (2) the conduct of the parties; (3) the usages of the business; (4) the situation and objective of the parties giving rise to the relationship; (5) the nature of the employment and (6) any other circumstances surrounding the employment relationship which would tend to make clear the intention of the parties at the time the employment relationship commenced. Id. at 513, 738 P.2d at 848-49 (Allegri, 9 Kan. App.2d at 659, Syl. ¶ 5, 684 P.2d at 1033). The parties must have a mutual intent to enter into an employment contract; plaintiffs' unilateral expectations of continued employment are insufficient to create a contract. See Panis v. Mission Hills Bank, N.A., 60 F.3d 1486, 1492 (10th Cir. 1995).

Plaintiffs claim that through its policies and practice, Maverick created an implied contract that it would not terminate their employment for engaging in activities which its employment manual required, i.e. reporting and/or investigating employee pornography use. See Pretrial Order at 17-18; Plaintiffs' Response at 140-41. To support their claim on summary judgment, plaintiffs cite provisions of the employment manual; they provide no other evidence of company practice or custom. See id.[31] Specifically, plaintiffs cite the statement in the handbook that Maverick would not take adverse action against an employee who made a good faith complaint of harassment. Plaintiffs also cite the provision which stated that employees could be fired for not following company rules, arguing that this obligation implies a counterpart obligation to not fire an individual for following such rules.

Maverick argues that plaintiffs cannot prove their claims because they rely solely on the employee handbook, which expressly states that it does not create a contract or change an employee's at-will status.

---

[31]     Plaintiffs argue generally that company practice conformed with the policies articulated in the manual, but they present no evidence in support thereof. See id.

An at-will disclaimer, however, is not determinative at a matter of law.  See Morriss,  241 Kan. at 514, 738 P.2d at 849.  It is but one factor to consider with all of the evidence relating to whether an implied contract existed between the parties.  See id.; see also Wilkinson v. Shoney's, Inc., 269 Kan. 194, 216, 4 P.3d 1149, 1164 (2000).

Here, the only evidence which plaintiffs cite to support an implied contract are provisions of the employee handbook which state that employees will not suffer adverse action for reporting harassment and that employees can be fired for not following the rules.  Standing alone, these provisions are insufficient as a matter of law to establish an implied contract of employment.  See Brown v. United Methodist Homes for the Aged, 249 Kan. 124, 137-38, 815 P.2d 72, 82-83 (1991); Kastner, 21 Kan. App.2d at 26-27, 894 P.2d at 917 (personnel rules which are not bargained for cannot alone be basis for contract of employment); Maus v. City of Towanda, Kan., 165 F. Supp.2d 1223, 1228 (D. Kan. 2001) (in absence of evidence of employer's practice, at-will disclaimer dispositive as matter of law); McCauley v. Raytheon Travel Air Co., 152 F. Supp.2d 1267, 1273 (D. Kan. 2001) (manual which stated nine reasons for termination and also stated that employment was at-will did not support finding of implied contract); Wood v. City of Topeka, Kan., 90 F. Supp.2d 1173, 1193-94 (D. Kan. 2000) (employment handbook alone insufficient to establish intent of employer to create implied employment contract); cf. Morris, 241 Kan. at 514, 738 P.2d at 849 (provisions of manual and statements by supervisors sufficient to create fact question as to implied contract); Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 538 (10th Cir. 1995) (personnel handbook plus evidence of employer's practice sufficient to create question of fact).  Maverick is therefore entitled to summary judgment on plaintiffs' claim for breach of implied contract.

**G.      Breach Of Shareholders Agreement (Count IX)**

Plaintiffs claim that defendants breached the shareholders agreement by (1) selling stock to Maverick without Board approval; (2) manipulating stock values to their own advantage and plaintiffs' disadvantage; (3) not properly valuing Maverick stock; and (4) refusing to recognize redemption events which required stock repurchase and capital return.

Defendants contend that plaintiffs cannot prevail because they cannot show that Hatch and Williamson sold shares to Maverick. Plaintiffs claim that as part of the Omaha Paper settlement, Maverick paid Hatch and Williamson $50,000 for the stock which it received from the Powells. Defendants argue that Maverick paid the money in exchange for Hatch and Williamson's agreement to abandon the promissory notes which they had received from the Powells, not to reimburse them for shares of stock. Construed in the light most favorable to plaintiffs, however, the facts suggest that Maverick received stock indirectly from the Powells in exchange for the payments to Hatch and Williamson. Moreover, the record suggests that contrary to requirements of the shareholders agreement, the Board did not approve the transaction.

Defendants assert that plaintiffs cannot show breach of the shareholders agreement because they have attempted to redeem plaintiffs' stock at its appraised value of $.01 per share, but plaintiffs refused. This argument ignores plaintiffs' claims that defendants have improperly valued the stock. Moreover, Sherri Litton's employment ended in January of 2002, before defendants had de-valued the stock to $.01 per share. Defendants are not entitled to summary judgment on plaintiffs' claim for breach of the shareholders agreement.

### H. Litton's Claims For Breach Of Demand Notes (Count X)

Litton claims that defendants are liable for the following amounts plus interest: (1) a loan of $27,300;

(2) a demand note for $1,000; and (3) a capital loan of $12,000.  See Pretrial Order ¶¶ 70-76.

Defendants contend that they have sent plaintiff a check for $17,994 to satisfy the $1,000 demand note and $12,000 capital loan.  As an initial matter, defendants raise these facts only in the argument section of their brief and not in the statement of facts, which does not comply with D. Kan. Rule 56.1.  See Oakview Treatment Ctrs. of Kan., Inc. v. Garrett, 53 F. Supp.2d 1184, 1186 n.1 (D. Kan. 1999) (court does not rely on factual material presented in format that does not comply with D. Kan. Rule 56.1).  Moreover, even if the Court considered the evidence, defendant does not provide facts which reveal how it calculated the amount due.  In any event, plaintiff asserts that the tender contained an overly broad release of liability.  On this record, the Court is unable to determine that defendants have satisfied their obligations in this regard.

Litton claims that defendants owe $27,300 for the CD which he pledged as collateral for the Hillcrest loan.  Litton contends that for tax reasons, he cashed the CD and loaned the money to Maverick to place in a new CD as collateral for the Hillcrest loan.  Defendants assert that they are not liable because the loan was not authorized.  They present no facts or legal authority, however, which supports their contention.  See Defendants' Memorandum at 68.  Construed in the light most favorable to plaintiff, it appears that as president, Litton could have authorized the loan.

Defendants contend that Litton cannot prove his claim without loan documentation, but they cite no legal authority that loan documentation is required.  See id.; see also Gage v. First Fed. Sav. & Loan Ass'n of Hutchinson, Kan., 717 F. Supp. 745, 753 (D. Kan. 1989) (if loan document is unenforceable, court might have option of ordering repayment of loan proceeds under quantum meruit theory).  Defendants also contend that the loan was fraudulent, but they cite no facts which support their contention.  See id.  On

48

this record, the Court cannot grant summary judgment.

### I.     Breach Of Duty Of Good Faith And Fair Dealing (Count XI)

Defendants assert that Kansas law does not recognize plaintiffs' claim for breach of duty of good faith and fair dealing because it is rooted in a commercial transaction.  In ruling on defendants' motion to dismiss, the Court found that Kansas law does not recognize such a claim in a commercial contract setting. See Memorandum And Order (Doc. #66) filed January 28, 2005 at 14-15 (citing Charles R. Wood Oil Co. v. GMAC Commercial Mortgage, No. 02-2206-JWL, 2003 WL 21555744 (D. Kan. July 2, 2003); Horizon Holdings, LLC v. Genmar Holdings, Inc., 241 F. Supp.2d 1123, 1148 (D. Kan. 2002); and Pizza Mgmt., Inc. v. Pizza Hut, Inc., 737 F. Supp. 1154, 1167 (D. Kan. 1990)).  The Court further found that defendants had cited no authority which supported their argument that Kansas law does not recognize the claim in the context of this case, which involves employment and shareholder relationships.

In support of summary judgment, defendants argue that the above cases apply because plaintiffs' claims relate to commercial transactions.  In support of their position, defendants cite Black's Law Dictionary, which defines a commercial tort claim as "a claim arising in tort when the claimant is either (1) an organization, or (2) an individual whose claim arose in the course of the claimant's business or profession, and the claim does not include damages arising out of personal injury or death." Defendants' Memorandum at 55 (citing Blacks' Law Dictionary (8th ed. 2004)).  Defendants do not explain how an employment contract and shareholders agreement constitute commercial transactions, nor do they cite any case law which suggests that they are.  On this record, defendants are not entitled to summary judgment on plaintiffs' claims for breach of duty of good faith and fair dealing.

J.       **Constructive Fraud (Count XII)**[32]

Plaintiffs claim that defendants are liable for constructive fraud because they were in a fiduciary relationship with defendants and defendants used their positions for their own gain. Specifically, plaintiffs allege that defendants (1) engaged in deceitful and fraudulent acts which operated to deprive plaintiffs of the value of their investments; (2) terminated plaintiffs' employment to avoid obligations due them; (3) manipulated the value of Maverick stock to avoid obligations to plaintiffs; and (4) engaged in self-dealing. See Pretrial Order ¶¶ 83-89.

Defendants seek summary judgment on plaintiffs' claim for constructive fraud. Constructive fraud is breach of a legal or equitable duty which the law declares fraudulent because of its tendency to deceive others or violate a confidence. Kampschroeder v. Kampschroeder, 20 Kan. App.2d 361, 364, 887 P.2d 1152, 1155 (1995). In order to show constructive fraud, plaintiffs must prove a confidential or fiduciary relationship and breach of that relationship. Id. at 364-65, 887 P.2d at 1155-56. Actual dishonesty or intent is not necessary. Id. at 364, 887 P.2d at 1155.

Maverick asserts that plaintiffs cannot show constructive fraud because it did not have a fiduciary relationship with them. Plaintiffs do not respond to this argument. Kansas law does not recognize a fiduciary duty between a corporation and its stockholders, see Burcham v. Unison Bancorp, Inc., 276 Kan. 393, 416, 77 P.3d 130, 146 (2003), and a corporation generally does not owe a fiduciary duty to its employees. See, e.g., Combs v. PriceWaterhouse Coopers LLP, 382 F.3d 1196, 1200 n.2 (10th Cir.

---

[32]      Defendants assert that although plaintiffs caption Count XII as a claim for "fraud and constructive fraud," it really asserts a claim for only constructive fraud. See Defendants' Memorandum at 56. Plaintiffs do not disagree. See Plaintiffs' Response at 155-56. The Court therefore interprets Count XII as asserting a claim for only constructive fraud.

50

2004) (applying Colorado law).  Maverick is therefore entitled to summary judgment on plaintiffs' claim for constructive fraud.

Hatch and Williamson argue that plaintiffs cannot prove constructive fraud against them.  Hatch and Williamson admit that as directors, they owed fiduciary duties to plaintiffs as shareholders.  <u>See</u> <u>Defendants'</u> <u>Memorandum</u> at 57.  They assert, however, that they have not breached any such duties.

With regard to plaintiffs' claim that defendants terminated their employment to avoid obligations due them, defendants argue that plaintiffs voluntarily resigned when Litton faxed Hatch the memorandum on January 9, 2002, which stated that he had set up himself and Sherri Litton to work as independent contractors effective January 1, 2002.  <u>See</u> <u>id.</u> at 58.  As discussed <u>supra</u>, on this record the Court cannot find as a matter of law that the January 9, 2002 memorandum changed the Littons' work status to independent contractors.  Moreover, it appears that plaintiffs' constructive fraud claim depends upon the fiduciary relationship between Hatch and Williamson, as directors, and plaintiffs, as shareholders – and not on plaintiffs' status as employees or independent contractors.  Regardless whether plaintiffs worked as employees or independent contractors, the record – construed in the light most favorable to plaintiffs – supports an inference that Hatch and Williamson owed plaintiffs fiduciary duties and terminated and/or demoted their jobs.  Hatch and Williamson are not entitled to summary judgment on this ground.

As to the claim that Hatch and Williamson manipulated the value of Maverick stock, defendants claim that because Litton was a member of the board, he is "guilty of the same malfeasance."  <u>Id.</u> Defendants cite no authority for their position, and on this record, they have not established that plaintiff's membership on the board precludes his claim as a matter of law.

Hatch and Williamson also argue that they did not breach any fiduciary duties with regard to

51

Maverick's buy-back of the stock which they had sold to the Powells.  See id. at 59.  Construed in the light

most favorable to plaintiffs, it appears that defendants inflated the value of Maverick stock which they sold

to the Powells and then when the Powells wanted out, they arranged to have Maverick reimburse them for

the stock at an inflated price.  Hatch and Williamson are not entitled to summary judgment on the

constructive fraud claims.

    **K.**        **Breach Of Fiduciary Duty Against Hatch And Williamson (Count XIII);**

Plaintiffs claim that Hatch and Williamson breached their fiduciary duties by (1) terminating plaintiffs'

employment in bad faith; (2) manipulating the value of Maverick stock to avoid obligations to plaintiffs; and

(3) engaging in self-dealing with respect to stock transactions.  See Pretrial Order ¶¶ 77-82.

Defendants contend that plaintiffs cannot prevail because they assert a shareholders derivative claim

and did not comply with the demand requirement of Rule 23.1, Fed. R. Civ. P.[33]  See  Defendants'

---

[33]     Rule 23.1 provides as follows:

In a derivative action brought by one or more shareholders or members to enforce a right
of a corporation or of an unincorporated association, the corporation or association having
failed to enforce a right which may properly be asserted by it, the complaint shall be
verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the
transaction of which the plaintiff complains or that the plaintiff's share or membership
thereafter devolved on the plaintiff by operation of law, and (2) that the action is not a
collusive one to confer jurisdiction on a court of the United States which it would not
otherwise have.  The complaint shall also allege with particularity the efforts, if any, made
by the plaintiff to obtain the action the plaintiff desires from the directors or comparable
authority and, if necessary, from the shareholders or members, and the reasons for the
plaintiff's failure to obtain the action or for not making the effort. The derivative action may
not be maintained if it appears that the plaintiff does not fairly and adequately represent the
interests of the shareholders or members similarly situated in enforcing the right of the
corporation or association.  The action shall not be dismissed or compromised without the
approval of the court, and notice of the proposed dismissal or compromise shall be given
to shareholders or members in such manner as the court directs.

(continued...)

Memorandum at 60-61.  A claim is derivative if the injury is either to the corporation directly, or to the shareholder but mediated through the corporation.  See Richards v. Bryan, 19 Kan. App.2d 950, 961, 879 P.2d 638, 646 (1994) (citations omitted).  A shareholder may litigate as an individual only if the wrong to the corporation inflicts a distinct and disproportionate injury on the shareholder, or if the action involves a contractual right of the shareholder which exists independently of any right of the corporation.  Id. "Whether a cause of action is individual or derivative must be determined from the 'nature of the wrong alleged' and the relief, if any, which could result if plaintiff were to prevail."  Id. (quoting Kramer v. W. Pac. Ind., Inc., 546 A.2d 348, 352 (Del. 1988)).

It appears that at least some of plaintiffs' claims – particularly with regard to termination of their employment – involve a distinct and disproportionate injury to them and/or a contractual right which exists independently of any right of the corporation.  See, e.g., Richards, 19 Kan. App.2d at 962, 879 P.2d at 647 (claim relating to termination of employment distinct to individual shareholder).  Moreover, because this case involves a closely-held corporation, the Court has discretion to treat it as a direct action so long as it will not (1) unfairly expose the corporation to a multiplicity of actions; (2) materially prejudice the interests of creditors; or (3) interfere with a fair distribution of the recovery among all interested persons.  See id. at 964-65, 879 P.2d at 648.  Such considerations are not present here.  Defendants maintain that plaintiffs cannot use the close corporation exception because defendants did not behave fraudulently.  See Defendants' Memorandum at 61-63.  Construed in the light most favorable to plaintiffs, the record suggests otherwise.  Defendants are not entitled to summary judgment on the breach of fiduciary duty claims.

---

[33](...continued)
Rule 23.1, Fed. R. Civ. P.

**L.      Fraudulent Misrepresentation Against Hatch (Count XIV)**

Litton claims that during negotiations to purchase Maverick, Hatch misrepresented the following facts: (1) Litton would have authority to run Maverick as president and CEO; (2) Hatch would meet the special needs of the paper industry, including prompt payment to vendors and tight credit controls; (3) Litton would control personnel decisions; (4) Hatch would support Litton's efforts to operate Maverick as a paper distributor and converting company; and (5) Hatch was committed to a long-term commitment and special business relationship with Litton and his family.  See Pretrial Order ¶ 91.

To prove fraudulent misrepresentation, plaintiff must show that (1) Hatch made an untrue statement; (2) Hatch knew the statement was untrue; (3) Hatch made the statement with intent to deceive or with reckless disregard for the truth; (4) plaintiff justifiably relied on the statement; and (5) plaintiff suffered injury as a result.  See Paper, Allied Chem. and Energy Workers Int'l Union, Local 5-508, AFL--CIO v. Slurry Explosive Corp., 107 F. Supp.2d 1311, 1328 (D. Kan. 2000) (citing Gerhardt v. Harris, 261 Kan. 1007, 1013, 934 P.2d 976, 981 (1997)).

Plaintiff's fraudulent misrepresentation claims fail for at least two reasons.  First, he has not presented sufficient evidence to support his claim that Hatch made the alleged representations.  See footnote 3, supra.  Second, he presents no evidence that the statements were untrue at the time Hatch made them. Hatch allegedly made the statements in late 1995, and the record suggests that he carried them out until at least 1999.  Plaintiff presents no evidence that Hatch knew that the representations were false at the time when he made them.  Hatch is entitled to summary judgment on this claim.

**M.      Paper Consulting And Design, LLC**

Defendant seeks to dismiss Paper Consulting And Design, LLC as a plaintiff because the complaint

asserts no claims on its behalf.  Plaintiffs respond that Paper Consulting And Design, LLC is a proper party because it is the entity which Ron Litton LLC became.  Regardless of its relationship to Ron Litton LLC, the fact remains that Paper Consulting And Design, LLC asserts no claims in this lawsuit.  The Court will therefore dismiss it as a plaintiff.

**IT IS THEREFORE ORDERED** that <u>Defendants' Motion For Summary Judgment</u> (Doc. #67) filed February 7, 2005 be and hereby is **SUSTAINED in part.**  The Court grants summary judgment in favor of defendants on the following claims: Sherri Litton's claims against Maverick for employment discrimination under Title VII (Count I); Ron Litton's claims against Maverick for breach of the executive employment agreement (Count IV); Ron Litton's claims against Maverick for breach of the personal services agreement (Count V); plaintiffs' claims against Maverick for breach of implied contract (Count VIII); plaintiffs' claims against Maverick for constructive fraud (part of Count XII); and Ron Litton's claim against Hatch for fraudulent misrepresentation (Count XIV).  In addition, Paper Consulting And Design, LLC is dismissed as a plaintiff in the case.

The following claims remain: Sherri Litton's claim against Maverick for retaliatory discharge under Title VII (Count II); Ron Litton's claims against Maverick for retaliatory demotion and discharge under Title VII (Count III); plaintiffs' claims against all defendants for breach of the shareholders agreement (Count IX); Ron Litton's claims against all defendants for breach of demand notes (Count X); plaintiffs' claims against all defendants for tortious breach of duty of good faith and fair dealing (Count XI); plaintiffs' claims against Hatch and Williamson for constructive fraud (part of Count XII); and plaintiffs' claims against Hatch and Williamson for breach of fiduciary duty (Count XIII).

Dated this 21st day of September, 2005 at Kansas City, Kansas.

s/ Kathryn H. Vratil

Kathryn H. Vratil
United States District Judge